LittletoN, Judge,
delivered the opinion of the court:
Plaintiffs bring this suit to recover $30,969 for the alleged breach by the Government of a lease under which the defendant leased from plaintiffs a portion of a certain tract • of land, together with a fishing pier, which extended into the ocean from the land on the coast of North Carolina, near Kure Beach south of Wilmington. Plaintiffs contend that a breach occurred when the Government failed to return the pier upon the expiration of the lease in as good condition as it was upon the Government’s entry, ordinary wear and tear excepted.
The pertinent provision of the lease reads as follows:
The Government shall * * * return the buildings and improvements located on the leased premises in as good condition as that existing at the time of entering upon the same under this lease, reasonable and ordinary wear and tear and damages by the elements or by circumstances over which the Government has no control, excepted; * * *
On August 1,1944, while occupied by the defendant under the lease, the pier was partially destroyed by a hurricane, and it is plaintiffs’ contention that if the defendant had kept the pier in proper repair, as plaintiffs had done prior to the making of the lease, it would have withstood the storm.
*235 The defendant actually took possession of the property, 'consisting of about 8 acres and the pier, on January 23,1943, under a court order resulting from a condemnation proceeding instituted in the United States District Court for the Eastern Division of North Carolina. Subsequent negotiations with plaintiffs led to the execution of the lease in •question on September 25, 1943, after which the case in the (district court was dismissed.
While the Government had no need for the pier as such, •it became necessary to take'possession of it, together with the land, because of its proximity to Fort Fisher, an Army post. The pier was located approximately 1% miles south of the northern boundary of the fort, and it became necessary for those desiring to use the pier to pass through an Army gate located on the post boundary. In 1941, when the surrounding-land of approximately 400 acres was leased from plaintiffs for the establishment of the fort, the small tract above-mentioned of 8.04 acres on which the pier was located was •excluded with the understanding that the operation of the pier for commercial purposes would continue. Plaintiffs further had an understanding with the commanding officers of the Army Post that persons desiring to patronize the pier would be permitted to pass through the Army gate to reach the pier. Difficulties developed however in the carrying out of this understanding. In addition, the use of the pier was restricted during the period when gun implacements along the ocean side of the fort were engaged in practice firing at targets out over the water. As a result, by the end of 1942, the situation in respect to continued operation of the pier was unsatisfactory to both the Army and the plaintiffs and, in January of 1943, the Government instituted the condemnation proceeding referred to above. After the court order of January 23, 1943, the pier was not open to the public. The restaurant which plaintiffs had erected on the shoreward end of the pier was converted into a post exchange. Soldiers were occasionally permitted to fish from the pier.
The Government occupation under the lease was terminated effective March 30, 1945. Plaintiffs’ petition was filed on April 27,1951. Since this date is more than six years subsequent to the termination of the lease, defendant asserts that *236 plaintiffs’ claim is barred by the statute of limitations, 28 XJ. S. C. 2501. While the termination was effective March 30,1945, the lease provided that the Government, if required by the lessor, should have a period of 30 days from date of termination to make necessary repairs. The Government was so requested by plaintiffs to make repairs. This matter of repairs did not, therefore, become closed until April 30, 1945. Plaintiffs’ petition having been filed on April 27,1951j is within the statutory period.
While the Army made'no repairs during its period of occupancy, and no agreement was ever reached as to what repairs the Army should be required to make, the Army did, prior to relinquishing possession, make repairs for which it considered itself obligated at a cost of $2,425. The parties have now agreed that the repairs so made cover all items of plaintiffs’ claim except the restoration of the storm damage.
The storm of August 1, 1944, was a severe one, and while it is not disputed that plaintiffs’ pier was well constructed, the damage which it sustained was similar to the damage sustained by every other fishing pier on this section of the coast.
Plaintiffs place great weight on the testimony of a Mr. Kure who was the pioneer of the locality in the construction and maintenance of fishing piers. His own pier was swept away by the storm on August 1. He testified that if plaintiffs’ pier had been kept in proper repair during the period of the lease it would have withstood the storm. Pie further testified however that the hurricane of August 1, 1944, was the worst storm he had experienced in his 40 years in the area. When considered in the light of this admission his testimony loses much if not all its weight.
The evidence fails to support plaintiffs’ contentions that their pier had been materially weakened because of its alleged misuse by soldiers and from being struck by stray bullets. Even if so found, it would fail to detract from the ultimate conclusion that the proximate and sole cause of the damage complained of here was the hurricane. The commissioner so found, and a consideration of plaintiffs’ exceptions fails to convince us that this finding is not correct.
*237 Since the lease relieved the Government from responsibility for damages caused “by the elements or by circumstances over which [it] has no control”, we find that there is no liability chargeable to the defendant on plaintiffs’ claim for damages by reason of defendant’s refusal to make further repairs. Plaintiffs’ petition will be dismissed.
It is so ordered.
LaRAmoke, Judge; Madden, Judge; Whitaker, Judge; and Jones, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the briefs and argument of counsel, and the report of Commissioner W. Ney Evans, makes the following findings of fact:
1. At all times material to this action plaintiffs were the owners of a fishing pier extending into the Atlantic Ocean on the North Carolina coast some 20 miles south of Wilmington. The pier was built in 1938. Plaintiffs estimated the cost, for labor and materials, as having been between $25,000 and $30,000.
The pier was designed by an engineer. It was constructed by local labor under the supervision of one Walter Winner, who had lived nearby for many years. Winner’s qualifications for the undertaking, according to plaintiffs’ testimony, consisted of his knowledge of the area, his devotion to fishing, his desire for a pier, and his conviction that he knew how to build one. The pier he constructed for plaintiffs was sound and sturdy when completed.
Lumber and poles for the pier were obtained from timber cut from property in the vicinity owned by plaintiffs or others. The cutting was done in a sawmill provided by plaintiffs. With materials so obtained, plaintiffs’ principal cash outlay for the pier consisted of the cost of labor. The cash outlay was approximately $18,000.
. 2. Pine poles, treated with creosote, were used for piling. The piles were driven small end down. Three piles were used for each bent (crosswise row), being one on each side, and one centered between them. “X” bracings made of 4" x 6" timbers were fastened to the center pile from each of *238 the outside piles. The three piles were then topped by a 26' cap sill of 10" x 10" cypress, fastened with drift pins,, to complete the bent.
Bents were placed 15 feet apart and connected by three-stringers of 3" x 10" pine 18 feet long, nailed to the cap-sills. The deck, made of 2" cypress, was nailed to the stringers. Guardrails were placed on the decking at either side, with tops slanted to form comfortable armrests.
At the shoreward end of the pier, fronting on U. S.. Highway 421, small buildings were erected, including a restaurant and drink stand and six overnight cottages. A shelter was placed on the pier for a bait and tackle shop.
The pier was 26 feet wide. It extended into the ocean, 20 feet above mean low water, 713 feet beyond the low waterline which marked the eastern boundary of plaintiffs’ property. At a point 713 feet from the low water line on the-north side of the pier, an ell extended southward for a distance of 105 feet. The ell had the same width as the pier,. 26 feet. The inside (western) dimension of the ell was 85-feet. The junction of the ell with the pier’s south side was braced with angular construction running at 45° from the-main stem to the ell. This junction began at a point 670-feet east of the low water mark.
The main stem of the pier was 900 feet long, extending seaward from the low water mark 713 feet and shoreward from the same mark 187 feet. The shoreward end of the pier was 343 feet east of Highway 421.
The ell extended southward 85 feet from the main stem of' the pier. Sometime after the pier was completed, a stair well was placed in the ell at its southern end, with steps leading to a fixed platform usable for landing from, boarding,, or anchoring a small boat.
3. When plaintiffs’ pier was built, there was only one other fishing pier along that section of the coast. This was the-Kure pier, begun in 1923, at Kure Beach, a small resort town 1 y2 miles north of plaintiffs’ pier. Two fishing piers were-later built at Wrightsville Beach 20 miles to the north. One was built in 1938; the other in 1939. These four piers were the only structures of their kind along that section of the- *239 coast at the time of the hurricane of August 1, 1944. Each of the four was seriously damaged by that storm.
After the war, each of these four piers was repaired and restored to use in some degree. When this case was tried, in Wilmington, North Carolina, in 1954, other fishing piers-were in the course of construction.
The design and construction of a fishing pier partake of' the nature of individual art and handicraft. Artisans differ-among themselves concerning the merits of design and methods of construction and the results obtained from the-various choices. Some designers and builders prefer construction with three piles to the bent; others prefer two,, considering the design more flexible. Some prefer concrete» piles. Most use wood: pine poles treated with creosote. Most drive the piles small end down. Kure, the pioneer of his locality, drove the piles butt end down.
The structures uniformly require constant maintenance- and repair. Wood piles tend to rot out between high and low water marks, and should be replaced at intervals of 14 or 15-years. Cap sills, stringers, and bracings must be watched continually for deterioration. Careful attention to the decking and guardrails is even more necessary, since these units-cannot be treated with weather resistant chemicals because-of the effect of the chemicals on the feet and hands of persons using the piers.
Kure’s pier was so designed that every element in it could be replaced and, in fact, all pilings had been replaced between 1926 and 1940. A pier so constructed can be maintained' indefinitely, except for damage or destruction by storms.
The design of plaintiffs’ pier was such that replacement-of the piles, while possible, would have represented a major construction effort, especially the replacement of the center-piles. The useful life of plaintiffs’ pier, at the time of' construction, was therefore not more than 20 years, assuming reasonable maintenance during that time.
4. During World War II the United States Army maintained a post known as Fort Fisher on the tip of the small peninsula which extends south from Wilmington and’ Wrightsville Beach, North Carolina, between the Cape Fear- *240 River and the Atlantic Ocean. Land for the post was rented from the owners. Plaintiffs’ complete holdings in the area comprised approximately 400 acres, most of which were > included in the initial Army leases for Fort Fisher made in 1941.
Plaintiffs’ fishing pier was located approximately 1% miles south of the northern boundary of Fort Fisher. Inasmuch as the pier represented a commercial, recreational operation, and was north of the Army post’s installations, the initial lease between plaintiffs and defendant omitted a small tract of 8.04 acres on which the pier was located, and the understanding was that the operation of the pier would be continued. The operation was continued accordingly during 1942.
The Army located a gate on Highway 421, on the post boundary north of the pier. Plaintiffs’ understanding with the commanding officers of the post was that persons desiring to patronize the pier would be permitted to pass through the gate. Difficulties developed in the transmission of instructions for such passes to the guards stationed at the gate. By the end of 1942, the situation in respect to continued operation of the pier was unsatisfactory to both the Army and the plaintiffs.
5. On January 19,1943, there was filed in the United States District Court for the Eastern Division of North Carolina a petition captioned “United States v. 8.04 Acres of Land, et al., Civil No. 165.” This action was for the condemnation of plaintiffs’ pier and the small tract of land on which it stood. The estate sought to be acquired was for a term of years expiring June 30,1943, renewable from year to year.
An order of the district court dated January 23, 1943, granted the United States immediate possession of the property. On June 14, 1943, the United States deposited into the registry of the court the amount of estimated compensation mentioned in the declaration of taking as due the property owners for the period January 23 to June 30,1943.
Following the execution of a lease covering the property in September 1943, the case in the district court was dismissed on July 26, 1944, and the amount that had been deposited was ordered returned to the United States.
*241 6. The lease was dated September 25, 1943.[1] It covered the 8.04 acres of land and the fishing pier located thereon. The rental was $4,250 per annum, for a term extending from January 23 through June 30, 1943, continuing from year to year subject to termination by the Government on 30 days’ notice. The lease contained the following provisions:
* * * The Government shall surrender possession of the premises upon the expiration or termination of this lease and, if required by the Lessor, shall, within 30 days thereafter, or within such additional time as may be mutually agreed upon, return the buildings and improvements located on the leased premises in as good condition as that existing at the time of entering upon the same under this lease, reasonable and ordinary wear and tear and damages by the elements or by circumstances over which the Government has no control, excepted ; provided that, if the Lessor requires the return of the premises in such condition, the Lessor shall give written notice thereof to the Government at least 20 days before the expiration or termination of the lease, said notice to specify the exceptions of the Lessor to the then existing condition. * * *
* * * As of the commencement date of this lease, a joint inventory and condition report of all personal property of the Lessor included in this lease, and also a joint physical survey and inspection report of the demised premises shall be made, said reports to reflect the then present condition, and to be signed on behalf of the parties hereto. * * *
7. A condition survey was made of the pier in March 1943, while the condemnation proceedings described in finding 5 were pending. In September 1943, in conjunction with the execution of the lease, the parties signed a joint survey and inspection report, which contained the following:
* * * The pier is in good general condition with the exception of the wiring which is in poor condition and the decking rotted in some places and a few sills show signs of rot. * * *
8. While, as the inspection report indicates, plaintiffs kept their pier in repair, no such work was done on the pier after *242 the Army took possession of it. The pier was not thereafter open to the public. The restaurant was converted into a post exchange, and tables and chairs were placed on the shoreward end of the pier for use by soldiers. Beer was sold at the post exchange. Soldiers were occasionally permitted to fish from the pier. Everyone was excluded from it while guns were being fired in target practice, as described in the next finding.
9. Guns for practice firing were placed at intervals all along the coastline on the ocean side of Fort Fisher peninsula, from the north gate on Highway 421 southward. Some of the installations were north of plaintiffs’ pier. Most of them were south of it. The guns varied in size from ma-chineguns, to anti-aircraft guns, to guns of considerably heavier caliber.
Moving targets were of three kinds: large targets towed on the surface of the water by tugboats, some distance out from the shore; lighter, if not smaller, targets towed in the air by planes; and a special rocket device launched from a ramp. The beach was divided into ranges, so that any one battery of guns could begin firing at a target as it came into-the range of that battery, and stop firing as the target passed into the next range.
One of the rocket launching ramps was located north of plaintiffs’ pier. Eockets were sent out from it to travel in a southeasterly direction: south toward plaintiffs’ pier, but eastward toward the open sea. The rockets followed the course of an arc unless (as they were designed to do) an-occasional rocket dipped or turned to make its flight erratic.
Machineguns were trained on the rockets. Occasionally, a. rocket dipped or turned toward plaintiffs’ pier, while the-gunners tried to keep it in range. Some machinegun bullets struck plaintiffs’ pier. After the storm damage to the pier, one of the piles that had washed ashore was sawed in two-at a point where it appeared to have been struck, and six machinegun bullets were found in it. The pile had not, broken at that point. The break had occurred at a lower-point, between high and low water marks.
*243 At least one of the heavy caliber guns was somewhere near plaintiffs’ pier. Vibration from the firing of the heavy gun (or guns) was sufficient to shake dishes from the shelves in one of the cottages at plaintiffs’ pier.
10. The hurricane of August 1, 1944, was a severe storm. Despite this, Mr. Eure testified that if the pier had been kept in proper repair it would have withstood the hurricane. He further testified, however, that it was the worst storm he had seen in his 40 years in that area. The Weather Bureau records support his observation. Winds reached a maximum velocity of 52 miles per hour, with gusts of greater velocity.
Storm damage at Atlantic Beach (five miles north of plaintiffs’ pier), at Wrightsville Beach, and at Wilmington was extensive.
As previously noted, all of the four fishing piers on that section of the coast from Fort Fisher to Wrightsville Beach were seriously damaged.
The outer two-thirds (approximately 600 feet) of plaintiffs’ pier was destroyed, and the wind and water took away two or three sections of the inshore portion, leaving the bulk of what remained extending from low water mark into the sea inaccessible.
The outer 200 feet of the Eure pier were destroyed at the height of the storm. As the storm continued, debris from plaintiffs’ pier was carried to the Eure pier and knocked out an additional 200 feet, besides doing extensive damage to the inshore installations of the Eure pier.
Damage to the two piers at Wrightsville Beach was of similar nature to that suffered by the piers of plaintiffs and Eure.
11. On February 24, 1945, the Army gave plaintiffs notice in writing of the termination of the lease effective March 30, 1945. The parties had theretofore had some negotiation concerning the forthcoming termination and the restoration and repairs to be made by the Army in consequence of its obligations under the lease. No agreement was reached, and the Army completed by March 19, 1945, the repairs for *244 which, it considered itself obligated, at a cost of $2,425. The parties have agreed, in connection with this case, that the repairs so made covered all items of plaintiffs’ claims except the restoration of the storm damage. As to that claim, plaintiffs, on April 4,1945, wrote to the Army as follows:
* * * We have not accepted * * * [your] notice and cannot accept the same until the terms of the lease contract are carried out, which have not been done to this time; and specifically, the pier must be returned to us in a condition equal to its condition at the time you leased it and the premises. On this we shall insist. We contend that the destruction of the pier was the result of negligence on the part of the Government and that the portion of the pier remaining must be restored to the same condi- * tion as when the Government took it over under the lease. * * *
* * * Please, therefore, take notice that we consider the property as still in your hands; that rentals will continue to be due us until the matters herein mentioned are disposed of and until acceptance by us of termination of the lease and repossession of the property, which cannot transpire until the pier is restored, the portion remaining repaired and restored or mutual settlement for the ensuing damages is determined and made. * * *
12. (a) During the months immediately following the storm damage to plaintiffs’ pier, the fair and reasonable cost of rebuilding the portions that had been washed away would have been $46,500.
(b) When the storm damage occurred, one-third of the useful life of plaintiffs’ pier had expired.
13. The damage to the pier of which plaintiffs complain in this action was caused by the hurricane. The evidence in the case considered as a whole does not warrant modification in any degree of this conclusion.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiffs are not entitled to recover, and the petition is therefore dismissed.

 The lease is In evidence as plaintiffs' exhibit 7, •which Is Incorporated herein by reference.